# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JACK L. MAHER,

                        Plaintiff,                    OPINION AND ORDER

    v.                                                    16-cv-129-wmc

TEXAS ROADHOUSE MANAGEMENT
CORP., DAVID A. HESS, and ABC
INSURANCE COMPANY

                        Defendants.

        In 2013 and 2014, plaintiff Jack L. Maher and defendant David A. Hess, an employee of defendant Texas Roadhouse Management Corp., had discussions about Maher coming to work for Texas Roadhouse.  Eventually, Maher resigned from his then-employer and began working for Texas Roadhouse, although not in the position he desired.  In this lawsuit, plaintiff brings claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, as well as common law breach of contract, promissory estoppel and fraud, alleging that defendants (1) intentionally misled him about the position he would fill, (2) failed to fulfill their promises regarding his opportunity to obtain that position, and (3) denied him that position because of his age.  Before the court is defendants' motion seeking summary judgment on all of plaintiff's claims.  (Dkt. #20.) Because the court finds that plaintiff has failed to put forth sufficient evidence from which a reasonable juror could find in his favor on the ADEA or common law claims, the court will grant defendants' motion for summary judgment in its entirety and enter judgment in their favor.

## A. Texas Roadhouse Overview

Defendant Texas Roadhouse Management Corp. is a subsidiary of Texas Roadhouse Inc., which owns and operates restaurants throughout the United States. The named defendant is the direct employer of all workers at the Texas Roadhouse restaurants. For ease of reference, therefore, the court will simply refer to defendant as "Texas Roadhouse."

Each Texas Roadhouse restaurant has a "managing partner," who is tasked with overseeing general restaurant operations, including supervising kitchen managers, service managers and hourly employees. Each managing partner has an ownership interest in his or her restaurant and is required to make a financial investment. Managing partners report to "market partners," who are responsible for supervising several restaurants. Market partners, in turn, report to one of three "regional partners," each being responsible for approximately a third of the Texas Roadhouse markets in the United States.

Defendant David Hess began working for Texas Roadhouse in 1998. His date of birth is February 16, 1972, making him 45 years old today and between 41 to 44 years old during the relevant events to this lawsuit. In 2006, he was transferred to serve as the managing partner of the Texas Roadhouse restaurant in Waukesha, Wisconsin; and in November of 2013, he became the managing partner of the Texas Roadhouse on the east side of Madison, Wisconsin. Hess also served as "interim" market partner for a group of restaurants, including the Waukesha and Madison restaurants between October of 2013

---

[1] For the purpose of deciding the present motion, unless otherwise noted, the court finds the following facts undisputed and material when viewed in a light most favorable to plaintiff as the non-moving party.

and approximately January 23, 2014.

An external candidate hired to be a permanent market partner is first hired as a "manager in training," who spends approximately four months at a designated Texas Roadhouse training restaurant. During the approximately four months that Hess acted as interim market manager, Rob LaPointe was completing training to take over that market partner position. At all times relevant to this lawsuit, Rick Kaskel was the regional partner for a market area that included the Wisconsin restaurants.

### B. Plaintiff's Background and Interview Process

Plaintiff Jack Maher's date of birth is September 27, 1967, making him 49 years old today, and between 46 and 47 years old during the events material to this lawsuit. By the time he began his employment with Texas Roadhouse, Maher had more than twenty-five years of experience managing restaurants. Most recently before Texas Roadhouse, he was a General Manager for a Red Robin restaurant earning $85,000 per year. In or around November of 2013, Maher's two sisters-in-law who worked at the Madison Texas Roadhouse restaurant told defendant Hess that Maher was interested in working for Texas Roadhouse. At that time, Maher was residing in Sun Prairie, Wisconsin, a suburb of Madison.

Hess contacted Maher to discuss working for Texas Roadhouse, and the two met in person on November 11, 2013. As part of his responsibilities as interim market partner, Hess was involved in the process to fill an open managing partner position at the restaurant in Waukesha, but he did not have the authority to actually hire the managing partner. The parties dispute whether Hess nevertheless *told* Maher that he did. (Defs.' Reply to Defs.'

PFOFs (dkt. #36) ¶¶ 26-27.)  At their November 11 meeting, Hess discussed "general information" about the company and the position, while Maher discussed his employment background.

In that initial conversation, Hess told Maher that there was a possibility of a managing partner position opening in Madison at some point in the future, either if Hess were promoted to a market partner position or if Texas Roadhouse opened another location.  Hess did not, however, provide Maher with a time-frame for when a managing partner position might become available in Madison.  Moreover, the parties agree that Hess made no offer of employment.

On November 15, 2013, Maher, who lived in Sun Prairie at the time, notified Hess by text message that he was not interested in the Waukesha position because "[w]ith the travel costs [he] would be taking a pay cut," but that he was "very interested" in positions that may be available in Madison.  (Defs.' Reply to Defs.' PFOFs (dkt. #36) ¶ 30.)  Hess responded by text message that he was not aware of any opportunities in Madison, but that he would contact Maher "when Madison bec[ame] an option."  (*Id.* at ¶ 31.)

On December 6, 2013, Maher received a job offer from Doolittle's Woodfire Grill restaurant in Madison.  However, Maher reports that he turned down the position because he "preferred" the Texas Roadhouse managing partner position, which he understood was available to him.  (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 136.)

The next day, on December 7, Maher sent a follow up text to Hess, "rethinking" his stance on the Waukesha position and hoping to "talk again soon."  (Defs.' Reply to Defs.' PFOFs (dkt. #36) ¶ 32.)  In response to Maher's message, Hess indicated that they "would

need to hurry" since the "position [was] almost taken." (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 137.) The two met at the Madison restaurant on December 10, 2013. This time, their discussion of the Waukesha managing partner position included Texas Roadhouse's requirement that managing partners must (1) make "an initial investment of $25,000 in their restaurant" and (2) sign an employment contract *after* they complete training. (Defs.' Reply to Defs.' PFOFs (dkt. #36) ¶ 33.)

While the parties again agree that Hess still did not offer Maher the position during that meeting, Hess did follow up afterward with Nicole Green, who worked in Texas Roadhouse's legal department, to begin the formal application process for Maher. Green then sent Maher an email with forms, including an employment application on December 20, 2013, which he completed that same day. For a reason Hess apparently did not explain, he told Maher to indicate that Maher was applying for a kitchen manager position, even though he was actually applying to be a managing partner.

Green interviewed Maher by telephone on December 23, 2013, including administering a personality test. Although they exchanged some communications by phone and text message after their meeting on December 10,[2] Hess and Maher did not meet again in-person until January 13, 2014. By the time of that meeting, Rob LaPointe, who was soon to become the permanent market partner, was present. The parties agree

---

[2] Plaintiff does not assert that communications during this period were material. Maher testified at his deposition that: (1) he could not recall whether he spoke to Hess over the phone on December 26, 2013 (Maher Depo. (dkt. #26) 71:21-72:5); and (2) text messages between them are included in the record and reflect limited contact regarding Maher's phone interview with Nicole Green, as well as Maher's notification that he would have no problem with the $25,000 "buy in." (Maher Depo., Ex. 9 (dkt. #26-6) ECF 4-7.)

that "one of the primary purposes of this meeting was for Maher to meet LaPointe." (Defs.'
Reply to Defs.' PFOFs (dkt. #36) ¶ 37.)[3]

At this January 13 meeting, the discussion regarding the Waukesha position
included salary expectations and Maher's possible commute from Sun Prairie to the
restaurant in Waukesha, which would take approximately an hour. The expected salary
for a Texas Roadhouse managing partner position, inclusive of bonuses, was approximately
$100,000. Defendants once again assert that Hess made no formal offer to Maher for the
Waukesha position during the meeting. Consistent with defendants' characterization of
the events, Maher testified at his deposition that he could "not recall" whether he had been
formally offered the position at the meeting and that his application "was an ongoing
process." (*Id.* at ¶ 39 (citing Maher Depo. (dkt. #26) 26:3-14).)

While Maher testified at his deposition that Hess also "told him" that he was
offering him the Waukesha position "around the time" of the meeting on January 13, 2014.
(Maher Depo. (dkt. #26) 31), Maher could not remember at his deposition what Hess said
specifically. Generally, Maher testified that: "[Hess] told me that the managing partner
position in Waukesha was open. He told me what it paid. And that was about it." (*Id.*)
Maher further testified that: (1) the offer "was [made] through phone and text" in "either
December of 2013 or January of 2014"; (2) Maher initially responded that he needed to
ask his wife about the commute; and (3) then "right around January 14th," perhaps after
the meeting, Maher told Hess during discussions held over phone and text, but not in

---

[3] According to Maher, he and LaPointe had both worked for Red Robin at the same time but the
two evidently did not speak much, and at least never about Maher's interest in working for Texas
Roadhouse. (Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶ 37.)

person, that he "was a go for that position," although he could not remember how Hess responded. (*Id.* at 32:14-33:21.)

In any event, on January 13, "several hours" after the meeting, soon-to-be marketing partner LaPointe called Hess and told him that Rick Kaskel, regional partner, "had decided" that Maher would need to move to Waukesha before he could be hired for the managing partner position. (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 41.) Hess opined that Kaskel imposed this requirement out of the belief that managing partners who lived in the same community as their restaurant could more easily attract guests there.[4] After receiving this call from LaPointe, Hess texted Maher that same day, at 6:31 p.m., warning "[w]e have a snag, please don't give your notice," and stating that he would call to further explain soon after. (*Id.* at ¶ 43; Maher Depo., Ex. 9 (dkt. #26-6) ECF 7.)

The parties do not dispute that Hess *did* call Maher shortly after sending that text, and they "discussed the issue of moving" during the call, but while defendants assert Hess told Maher he would need to move *before* he could be hired for the Waukesha position, plaintiff insists that Hess merely said that he would need to move *at some point* while he

---

[4] As plaintiff points out in his additional proposed findings of facts, eleven out of seventeen managing partners identified by defendants as having worked in that role in Wisconsin from January 1, 2014, to December 5, 2016, do *not* live in the same city or town as the restaurant that they manage. Hess himself commuted from Oconomowoc to his management partner position on the east side of Madison, roughly the same distance as commuting from Sun Prairie to Waukesha. (Pls.' Add'l PFOFs (dkt. #37) ¶ 164.)

was managing partner.  (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 44.)[5]

The next morning, January 14, Maher sent Hess a text asking two questions: (1) "If I decided on Waukesha I would train with you for four months correct?"; and (2) "Also, would there be an understanding that I would go to Madison either when you are promoted or a west side location opens?"  (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 148.)  In a text response, Hess indicated that Janesville would be the most likely location for training and stated, "Yes . . . 'the understanding' is our wild card option."  (*Id.*)  In that same text message, Hess also wrote: "We want [you] with us"; "holding you in Waukesha is our best move to get you on quickly and support your salary needs"; and "We'd love you as an addition."  (*Id.* at 150.)  At his deposition, Hess explained that by using "we" in his message, he was referring to himself and LaPointe, who told Hess that Maher would be a "good candidate."  (Hess Depo. (dkt. #31) 47:11-48:8.)  In response to that text, Maher asked Hess how quickly he needed an answer regarding the "option," to which Hess replied that it would be best for him to do so soon, but that he should take enough time to be comfortable and have a discussion with his family.  (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 152.)

---

[5] Defendants challenge this and other proposed findings of facts under the "sham affidavit" rule, arguing that certain averments in Maher's declaration submitted in opposition to defendants' motion for summary judgment conflict with other evidence in the record.  Defendants are correct that "parties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."  *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996).  For this rule to apply however, the defendant must offer a prior, sworn statement (*e.g.*, Maher's deposition testimony), *and* the declaration must *contradict* that prior statement.  With respect to this specific challenge, defendants take issue with Maher's inability to recall the specifics of the January 13 discussion during his deposition.  (Defs.' Reply (dkt. #35) 4.) While a valid basis for challenging his credibility if this case were to proceed to trial, the court does not view, here at least, the *absence* of specific testimony in his deposition as contradicting an express averment.

In other text message exchanges between the two on the 14th, Maher considered buying a car instead of his truck, so that travel would be less expensive. Hess responded that it was sometimes "tough" for him to travel an hour to Madison, and he offered that Texas Roadhouse could "do a small allowance to help" for gasoline costs. (*Id.* at ¶ 153.) In a declaration, Maher avers that he was referring to the contemplated travel costs going from Sun Prairie to Waukesha and back, but testified at his deposition that the reference to "that drive" in the text message exchange with Hess concerned Maher driving back and forth for training -- in other words, the drive from Madison to Janesville and back for the four-month training period. (Maher Depo. (dkt. #26) 80-81.)[6]

The next day, January 15, Hess texted Maher to tell him that LaPointe would call him the following day to answer any questions and "finalize up." (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 154.) Hess also sent Maher an overview of Texas Roadhouse's health insurance. On the 16th, Maher notified Hess by text message that "someone leaked the info about [him] leaving [Red Robin] and [he] had to put in [his] notice." (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 48.) At his deposition, however, Maher testified that when his supervisor at Red Robin approached him about interviewing for other positions, he decided to "just put in [his] notice" because he "felt that [he] had the position at Texas Roadhouse for the managing partner position in Waukesha." (*Id.* at ¶ 49 (citing Maher Depo. (dkt. #26) 84:1-9).) More specifically, Maher testified that he "felt" that he had a formal offer for the position based on his "conversations" with Hess and LaPointe, even

---

[6] While this later averment in paragraph 15 of Maher's declaration arguably violates the sham affidavit rule, there is no dispute that at least by January 13, 2014, Hess had told Maher that commuting from Sun Prairie to Waukesha was not an option. (Defs.' PFOFs (dkt. #22) ¶ 52.)

though he did not have an offer letter and had not seen a written contract. (*Id.* at ¶ 51 (citing Maher Depo. (dkt. #26) 84:10-22).)

On January 16, in response to Maher's message, Hess asked him when he wanted to "start." (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 156.) The following day, January 17, Maher and Hess spoke over the telephone. During that conversation, Hess reiterated that commuting from Sun Prairie to Waukesha was not permissible, but he offered Maher a kitchen manager position at the Texas Roadhouse in Madison, which offered an annual salary of approximately $50,000. Maher also sent Hess a text that day asking him whether he found the explanation of benefits for the insurance offered by Texas Roadhouse. Finally, Maher sent another text asking: "I sign the partner contract at the end of training correct?" and "[a]lso, once we are good to go can I get a copy of the partner contract[?]" (*Id.* at ¶ 158 (citing Maher Depo., Ex. 9 (dkt. #26-6) ECF 14).)

Three days later, on January 20, 2014, Maher sent Hess a text stating, "I just wanted to know from you if Waukesha is 100 percent if I move. Or if I decide not to [do] that you 100 percent have a spot for me with manager pay." (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 56.) Maher clarified at his deposition that the latter option to which he referred was the Madison Texas Roadhouse position. (*Id.*) In response to Maher's text message, Hess told him to speak to LaPointe regarding any further details about the Waukesha managing partner position, since LaPointe was nearly done with his market partner training, but that Hess, as the managing partner of the Madison restaurant, could continue discussing the kitchen manager position with Maher. (*Id.* at ¶ 57.) Later that same day, Maher sent Hess two more text messages stating that he still needed to speak to his wife

regarding moving and that LaPointe told him that "if [he] moved we were good." (*Id.* at ¶ 58.) Plaintiff does not dispute that when he sent the January 20 text message, he understood that he had to move to Waukesha to be the managing partner there. (*Id.* at ¶ 59.) Indeed, a few days later, on January 23, Maher sent LaPointe an email asking what he needed to do "to pursue" the managing partner position in Waukesha. (*Id.* at ¶ 61.)

Having not heard from Maher regarding whether he wanted to move to Waukesha for the managing partner position, Hess sent him an email the morning of January 28, 2014. In that email, Hess reiterated that the Waukesha position would not be available to him until he had already moved, but suggested that if he was still unsure about moving, Texas Roadhouse could hire him as an assistant manager for the Madison restaurant as soon as possible, and then the two could work together in Madison "until another option arises," although Hess admitted that he "did not know when or what the 'other options' are." (Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶ 67.)

Minutes later, Maher responded, indicating that he could start in the Madison kitchen manager position as early as February 10 and that a salary of $55,000 would be sufficient. At his deposition, according to Maher, he had not decided *definitively* whether he would move to Waukesha by the time he responded to Hess's email, and he understood that the position would still be available to him as long as he moved before completing his kitchen manager training. (*Id.* at ¶ 69.) The parties also agree that Hess never told Maher that he was "guaranteed" the Madison managing partner position in the event that it became available while he was kitchen manager. (*Id.* at ¶ 73.) While Maher contends Hess never told him that any future promotion would be conditional on his performance

as kitchen manager, he conceded during his deposition that he would have to prove that he could do the position. (Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶ 74.)

On January 31, 2014, Texas Roadhouse sent Maher an offer letter for the Madison kitchen manager position, with an annual salary of $45,000 and guaranteed bonuses to bring his annual income to $60,000, contingent on completing training. It is undisputed this is the only written offer letter that Maher received from Texas Roadhouse. Maher testified at his deposition that he accepted this position, at least in part, because he no longer had a job at Red Robin and was not pursuing other opportunities at that time.

### C. Kitchen Manager and Interim Managing Partner Position

Maher began training for a kitchen manager position on February 5, 2014, in Janesville, Wisconsin. In addition, he received some training on aspects exclusive to the managing partner role. On April 30, 2014, while Maher was still training, Texas Roadhouse filled the managing partner position in Waukesha. Maher completed training on June 11, 2014, and began working as kitchen manager the following day.[7]

As kitchen manager, Maher reported directly to Hess, who was the managing partner of the Madison Texas Roadhouse. According to defendants, "[w]ithin a few months of Maher beginning as Kitchen Manager in the Madison restaurant, Hess began having concerns about Maher's leadership style," including that "he was not gaining the respect of other restaurant employees he supervised." (Defs.' PFOF (dkt. #22) ¶ 83 (citing Hess Decl. (dkt. #24) ¶ 45).) Hess recalls having at least one conversation with Maher in

---

[7] As part of his orientation, Maher receiving training and materials on the Company's policies and practices prohibiting harassment and discrimination. (Defs.' PFOFs (dkt. #22) ¶¶ 79-80.)

which he used the sports analogy of "winning the locker room" to express his concern about Maher failing to "gain[] the respect of the other employees or lead[] by example." (*Id.* at ¶ 84 (citing Hess Decl. (dkt. #24) ¶ 46).) Hess also avers that in 2014, other managers at the Madison Texas Roadhouse relayed their "concerns about Maher's management style," which included "a perceived lack of leadership" and a lack of "attention to detail, passion, energy, and dedication required of [Texas Roadhouse] managers." (*Id.* at ¶ 85 (citing Hess Decl. (dkt. #24) ¶ 47).) As an example of Maher's supposed lack of leadership skills, defendants point to a meeting that took place in late 2014 that a different manager held with employees to address lagging holiday gift card sales, which Maher did not attend, even though ensuring strong gift card sales was his responsibility. Overall, Hess "considered Maher's performance as Kitchen Manager in 2014 to be mediocre, at best," because "[h]e was doing most of what he needed to do to get the job done but lacked passion for [Texas Roadhouse] and had demonstrated poor leadership skills." (*Id.* at ¶ 88 (citing Hess Decl. (dkt. #24) ¶ 50).)

Plaintiff does not dispute any facts regarding the gift card meeting, and also acknowledges having a conversation with Hess about "winning the locker room," but he disputes that the conversation was about anything other than presenting a generic message for him to "lead by example and make sure the management team respected [him]." (Maher Depo. (dkt. #26) 114:11-17.) Contrary to defendants' assertions, Maher further avers that his individual performance was never discussed at weekly manager meetings. Plaintiff also emphasizes that Hess never took notes about any performance issues by Maher, despite testifying at his deposition that he spoke to other assistant managers at the

Madison restaurant who raised similar concerns about Maher. In addition, plaintiff points out that Maher received no disciplinary actions until February 19, 2015, when Hess wrote him up for a cash discrepancy and placed him on an "action plan." Even then, Hess never raised concerns regarding Maher to his own supervisors.

### D. Opening for Madison Managing Partner Position

In September of 2014, Texas Roadhouse fired market partner Rob LaPointe. Hess replaced LaPointe on an interim basis, while continuing to serve as managing partner at the Madison restaurant. In late 2014, Hess learned that Texas Roadhouse was going to promote him to market partner, and so he began the process for filling the Madison managing partner position. At some point, Hess asked Maher whether he was interested in and felt prepared for the responsibilities of the managing partner position. On at least two separate occasions, including at least once before LaPointe was fired, Hess also asked Maher whether he was prepared to make the $25,000 managing partner "investment."

Along with Maher, Hess considered two others for the open managing partner position: another internal candidate, Tom Higgins, then 34 years old, as well as an external candidate, Ron Lamberty, who was 58.[8] Higgins had been a kitchen manager for Texas Roadhouse since 2011 and had also had two successful stints as interim managing partner for the Madison restaurant in 2013 and a Texas Roadhouse in New Berlin in 2014. Lamberty had come to Hess's attention through a recruiter.

Based on the recommendation of his regional partner, Rick Kaskel, Hess had Maher

---

[8] Higgins and Lamberty were born on August 28, 1980, and September 18, 1956, respectively.

and Higgins each spend three days in December of 2014 working with Kenneth Cohen, a managing partner of a Texas Roadhouse in New Jersey, who was described as "one of the most successful" managing partners. (Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶ 102.) According to Maher, at some point during those three days, Cohen told him that being a managing partner "was a grueling position; and at our age, there's only so long that you could do it." (*Id.* at ¶¶ 104, 107 (quoting Maher Depo. (dkt. #26) 180:17-19).)

As for Cohen's feedback from his observations during those three days, Hess claims Cohen thought that both Maher and Higgins had strengths and could be successful managing partners, adding that "while Maher had more experience in the restaurant industry, Higgins was more immersed in the [Texas Roadhouse] culture and seemed to have more of a passion for the [c]ompany."[9] (*Id.* at ¶ 106 (citing Hess Decl. (dkt. #24) ¶ 63).) Hess did not interpret Cohen's comments to be a recommendation of one candidate or the other, and Hess agreed with them based on his own experiences with Maher and Higgins. Moreover, when Cohen and Hess discussed the candidates, Hess maintains -- and plaintiff does not dispute -- that Cohen did *not* make any comment to Hess about Maher's age.

### E. Maher's Appointment as Interim Managing Partner

As of January 1, 2015, Hess became a market partner on a permanent basis, and

---

[9] Hess's description of what Cohen told him is obviously hearsay, but plaintiff does not object to it on that basis or otherwise. Moreover, while hearsay statements are inadmissible for the truth of the matter asserted, the court can consider the statements for their effect on Hess's assessment of Maher. Regardless, plaintiff does not dispute Hess's representations of Cohen's statements. (Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶¶ 102-07.)

thus had the authority to select the managing partner for the Madison restaurant. That same day, he named Maher as interim managing partner for the Madison restaurant, rather than immediately promoting him to managing partner, reportedly because he had concerns about Maher's ability to do the job well based on his performance as kitchen manager in 2014.

According to Hess, he interacted "regularly" with Maher as an interim managing partner, and he "continued to observe that Maher was not a strong leader and did not seem to have embraced the [Texas Roadhouse] culture." (Defs.' PFOFs (dkt. #22) ¶ 111 (quoting Hess Decl. (dkt. #24) ¶ 69).) Maher disputes Hess's description of their interactions, claiming that: (1) Hess was only present at the Madison restaurant one or two times per week; (2) they "rarely had conversations"; and (3) they never discussed Maher's leadership or immersion in Texas Roadhouse's culture. (Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶ 111 (citing Maher Decl. (dkt. #32) ¶¶ 19, 21, 28).)

Hess also maintains that he had doubts about Maher's ability to carry out the managing partner job duties. On January 21, 2015, Hess sent Maher an email to address multiple concerns about the performance of the Madison restaurant, including "incorrect cash information, a high service labor percentage, and Maher's failure to provide coaching results." (*Id.* at ¶ 112.) [10] Hess further avers that during the period Maher served as interim managing partner, at least two employees at the Madison Texas Roadhouse told Hess that

---

[10] In addition, defendants cite sales figures for the Madison Texas Roadhouse that they aver were among the lowest of the eight other Wisconsin Texas Roadhouse restaurants to which Madison was compared, although Hess acknowledged his ultimate decision to hire Higgins for the permanent managing partner position rather than Maher was *not* based on the Madison restaurant's sales performance.

they did not want Maher to be promoted to managing partner because they did not believe that he would do well in that role.[11]

### F. Higgins Offered Managing Partner Position

On or around February 15, 2015, Hess offered Higgins the managing partner position, rather than Maher or Lamberty. Hess avers that he selected Higgins because he had "excellent qualifications, strong leadership skills, and [a] proven track record with [Texas Roadhouse]." (Defs.' PFOFs (dkt. #22) ¶ 116 (citing Hess Decl. (dkt. # 24) ¶ 74).) At his deposition, Hess further explained that Higgins was the superior candidate from a "people standpoint," and he had passion that "you could see." (Defs.' Resp. to Pl.'s Add'l PFOF (dkt. #37) ¶ 188 (quoting Hess Depo. (dkt. #31) 102-03).) In addition, Hess hired Ron Lamberty in February 2015 as a "one-up" managing partner, which is a position for which a strong managing partner candidate is hired if there is no specific managing partner position available.

Hess avers that he did not know what Maher's age was when he originally decided to hire him as kitchen manager in 2014 or when he promoted Higgins over Maher to managing partner in 2015. In contrast, Maher testified that the two had spoken about his age multiple times, and that after he made the decision to promote Higgins, Hess told him that he was "too old to change [his] style." (Defs.' PFOFs (dkt. #22) ¶ 127 (quoting Maher

---

[11] Here, too, defendants offer hearsay statements, without objection by plaintiff. Still, the court will only consider the alleged statements of other employees for the effect that they had on Hess's assessment of Maher and not for the truth of the matter asserted. Regardless, as with Cohen's statements to Hess, Maher does not dispute the substance of other employees' statements. (*See* Pl.'s Resp. to Defs.' PFOFs (dkt. #29) ¶ 113.)

Depo. (dkt. #26) 136-137).)   At his deposition, Hess denied making that specific statement, suggesting instead that Maher must have misunderstood the context of his actual statement, which was that he had "g[iven] [Maher] enough time to adapt to what Texas Roadhouse would require."  (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 185 (quoting Hess Depo. (dkt. #31) 120).)   Maher initially decided to remain in kitchen manager position when learned of Higgins hiring, but then submitted his resignation approximately two weeks later, on March 3, 2015.


## OPINION

Federal Rule of Civil Procedure 56(c) requires that the court grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  Summary judgment is appropriate only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 970 (7th Cir. 2004) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  Here, plaintiff brings claims under the ADEA against defendant Texas Roadhouse, as well as Wisconsin common law claims against Texas Roadhouse and Hess for breach of contract, promissory estoppel and fraud.  The court addresses each claim in turn below.

## I.  ADEA Claim

As an initial matter, while acknowledging that plaintiff pleaded in his complaint four different, alleged adverse employment actions, defendants argue in their opening brief that plaintiff's age discrimination claim is limited to the decision to promote Higgins to managing partner, since that was only action he asserted was age-based at his deposition. In opposition to defendants' motion for summary judgment, plaintiff similarly makes arguments directed only toward his failure to promote claim, effectively conceding that is the only basis on which he premises age discrimination.  Accordingly, it is on this action that the court will focus its analysis of his ADEA claim.

The ADEA prohibits an employer from discriminating "because of [an] individual's age."  29 U.S.C. § 623(a)(1).  Because Maher was 47 years old in February 2015, he qualifies for protection under the ADEA.  29 U.S.C. § 631(a) (extending its protections to individuals forty and over).  As such, Maher "may avoid summary judgment by providing either direct or circumstantial evidence that would allow a reasonable juror to infer that her employer acted for discriminatory reasons."  *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014).  To establish a *prima facie* violation of the ADEA, "an employee must show that age actually motivated the adverse employment action at issue.  Put differently, age must have played a role in the employer's decision-making process and had a determinative influence on the outcome."  *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013) (quoting *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010)).

Although the distinction and its utility has been called into question, as discussed

below, an employee has generally been allowed to make this showing on summary judgment using either the direct or indirect method of proof. *See Mullin*, 732 F.3d at 776; *see also Hutt v. AbbVie Prods., LLC*, 757 F.3d 678, 691 (7th Cir. 2014). Regardless, Maher satisfies neither method of proof here.

The indirect method of proving discrimination is set forth in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and requires a plaintiff to establish that: (1) he is a member of the protected class (for age discrimination over 40 years old); (2) he was performing well enough to meet his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably. *See Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002) (citation omitted). The burden then shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant makes this showing, then the burden shifts back to the plaintiff, who must show that the proffered reason is pretextual. *Id.*

Under the direct method of proof, a plaintiff must present direct evidence of unlawful discrimination or establish a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012) (quoting *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (internal citations and quotations omitted)). "Direct evidence requires an admission of discriminatory intent, i.e. 'smoking gun' evidence." *Hutt*, 757 F.3d at 691 (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (internal quotation marks and citations omitted)).

"Circumstantial evidence," by contrast, "typically includes (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over [or terminated] in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Id.*

As the Seventh Circuit clarified in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), however, the evidence on summary judgment need not be separated into piles of indirect and direct proof; rather, the relevant evidence must be considered as a whole, making the standard for practical purposes "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765-66. As such, Maher can avoid summary judgment only if he has marshalled sufficient evidence from which a reasonable jury could infer that age was the but-for cause of failure to promote. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014); *see also Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 603 (7th Cir. 2012) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

With respect to burden shifting, there is no dispute as to the first and third elements: Maher is a member of a protected class; and he was not promoted. As for the second element, concerning his qualifications, plaintiff points out that Hess conceded he was qualified, albeit Hess's concession was limited to the *financial* aspects of the job, while

pointing to a lack of discipline, performance notes, and escalations concerning his performance.  Still, these are all matters for a jury to sort out based on arguably conflicting evidence.  As for the fourth element -- concerning a similarly situated younger individual -- Maher points out that both he and Higgins were kitchen managers, but that Maher had 25 years of experience and good sales figures as interim managing partner, ultimately arguing that Texas Roadhouse has failed to adequately explain its subjective reasons for choosing Higgins, relying principally on soft skill characteristics (*e.g.*, people skills and passion).[12]

Moreover, plaintiff asserts that Higgins lacked the two to three years of experience in a managerial role before becoming a managing partner, and Hess was not aware of Higgins' managerial experience before hiring him.  Cumulatively, plaintiff has, therefore, put forth sufficient evidence to demonstrate a *prima facie* case under the indirect method, although it is hardly compelling.  Where plaintiff's claim falters is on the pretext prong, which involves the same core question under the direct method.  In support of his claim that he was passed over for promotion because of his age, plaintiff directs the court to two pieces of evidence:  (1) another managing partner's (Cohen's) passing statement *to Maher* that the managing partner position is a "grueling position; at our age, only so long you could do it"; and (2) Hess's post-decision explanation that Maher was "too old to change [his] style."  As for the *first* alleged statement, even resolving the dispute and drawing

---

[12] Indeed, while typically discussed as "direct" proof, one could argue that a lack of "passion" is a loaded term when it comes to age discrimination, in at least some circumstances, being a euphemism for "youthful enthusiasm."  However, even Maher does not make this assertion here, and for reasons set forth in the pretext discussion above, it is not enough to get plaintiff over the summary judgment hurdle.

reasonable inferences in plaintiff's favor, Cohen was not a decisionmaker. Perhaps, plaintiff intended to develop a "cat's paw" theory,[13] but plaintiff concedes that Hess did not understand Cohen as recommending a particular candidate, and Cohen did not make any observations about Maher's age in discussing the two candidates with Hess. (Defs.' PFOFs (dkt. #22) ¶¶ 105-06.) At most, this was an isolated comment to the plaintiff, not contemporaneous to an adverse employer decision and it is inadequate for purposes of surviving summary judgment. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 854 (7th Cir. 2015) ("[I]solated comments are not probative of discrimination unless they are 'contemporaneous with the discharge or causally related to the discharge decision-making process.'" (quoting *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012)); *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("It is well established that 'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself,' are insufficient to satisfy a plaintiff's burden of proof in an employment discrimination case." (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring))).

*Second*, plaintiff points to Hess's alleged statement that Maher was "too old to change [his] style," made after the decision to promote Higgins as the managing partner. While this may prove a closer question, even viewed in conjunction with Cohen's alleged comment and the other evidence of Maher's experience versus Higgins', the evidence is

---

[13] *See Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (the cat's paw theory requires proof that another employee "use[d] the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action").

insufficient from which a reasonable jury could infer but-for causation.[14]  Even plaintiff effectively concedes that this evidence does not meet the but-for standard in his opposition brief:  referring to this statement, plaintiff states, "Hess based his decision to hire Higgins over Maher, *at least in part*, on his perception that Maher was 'too old to change.'"  (Pl.'s Opp'n (dkt. #28) 6.)  While perhaps this evidence would be sufficient in the Title VII context where a showing of discriminatory animus as a "motivating factor" for an adverse employment action provides limited relief, a claim under the ADEA requires more.  *See Gross*, 557 U.S. at 177-79.

Moreover, viewing Hess's alleged comment in context, no reasonable jury could infer age was a "but for" factor.  First, Hess is himself over age 40, just five years shy of Maher's age.  Second, Maher was considered for a managing partner position a year before, and *all* evidence suggests he would have been offered that position if he had been willing to move.  Third, Hess negotiated and supported Maher's original application to be the Waukesha managing partner; he hired Maher at the age of 48 as kitchen manager, just one year before he was allegedly denied a promotion because of his age; *and* he promoted Maher to an interim managing partner role, giving him a "leg up" before ultimately deciding he was not right for the position after watching him perform and getting strong negative feedback from those Maher was managing.  Indeed, these two decisions were only made a

---

[14] As defendant points out, plaintiff's reliance on the relative qualifications of Maher and Higgins fails to move this case across the summary judgment line, since pretext requires showing that no person could have passed up Maher because he was "so superior" to Higgins.  *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180-81 (7th Cir. 2002).  Moreover, while Maher takes issue with defendants' failure to inform him of performance concerns, he fails to meaningfully dispute the substance of those concerns.

few months apart, while Maher remained exactly the same age. Fourth and finally, at the same time Hess made the alleged statement, he also hired Ron Lamberty, born in 1956, and thus more than ten years older than Maher, to fill a "one-up" managing partner position.

All of this cuts deeply against any possible inference of discriminatory animus on Hess's part. *See Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. 2009) (explaining that this "common actor" fact -- where the individual making the hiring decision also makes the firing decision -- creates a "strong inference" of nondiscrimination); *Rand v. CF Industries*, 42 F.3d 1139, 1147 (7th Cir. 1994) (same). Viewing the evidence as a whole, the court finds that plaintiff has failed to put forth sufficient evidence from which a reasonably jury could find that Maher was denied the managing position promotion because of his age.

## II. State Law Claims

Plaintiff asserts various state law claims: a breach of contract claim against defendant Texas Roadhouse, promissory estoppel claims against both defendants and fraud claims against both defendants.[15] All of these claims turn on an alleged offer, promise or

_____

[15] In his complaint, plaintiff alleges that the court has subject matter jurisdiction over the ADEA claim pursuant to 28 U.S.C. § 1331, and the court may exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Having determined that defendants are entitled to summary judgment on plaintiff's sole federal law claim, the court would typically dismiss the state law claims without prejudice. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("The usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). While plaintiff fails to allege properly the citizenship of the parties -- having alleged residence, not domicile for the individual defendants and alleged state of incorporation and principal place of business, rather than its members' citizenship for the LLC defendant -- it appears very likely that the court would have jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a). Regardless, the allegations supporting the state law claims

25

misrepresentations regarding the Waukesha or the Madison managing partner positions. Because the undisputed facts fail to support an actionable offer, promise or misrepresentation under Wisconsin law as to either position, the court will grant summary judgment to defendants on the state law claims as well.

### A. Claims Based on Waukesha Managing Partner Position

Putting aside the issue of whether the managing partner position is an at-will position, the undisputed evidence demonstrates that there was no definite offer of a managing partner position at the Texas Roadhouse Waukesha location, or at the very least plaintiff has failed to put forth sufficient evidence from which a reasonable jury could find otherwise. While the record certainly reflects ongoing, detailed negotiations, the evidence also establishes definitively that there was no offer that would not have *required* Maher to move to the Waukesha area. Indeed, this was the *key* sticking point in the negotiations. *See MacHesky v. Milwaukee*, 214 Wis. 411, 412, 253 N.W. 169 (Wis. 1934) ("[A]n offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain.").

As described above in the fact section, it is also beyond dispute that Maher knew that he would have to move to Waukesha as a condition of getting the managing partner

_____

are so closely connected to those supposedly supporting plaintiff's ADEA claim, and the outcome so clear, the court will continue to exercise its supplemental jurisdiction as a matter of judicial economy, addressing defendants' motion on those claims as well. *See Groce*, 193 F.3d at 502 (explaining that a court may depart from "usual practice" and continue to exercise supplemental jurisdiction over "'doomed litigation' that will only be dismissed" in state court); *In re Repository Tech., Inc.*, 601 F.3d 710, 725 (7th Cir. 2010) ("[W]hen a state-law claim is clearly without merit, it invades no state interest -- on the contrary, it spares overburdened state courts additional work that they do not want or need -- for the federal court to dismiss the claim on the merits, rather than invite a further, and futile, round of litigation in the state courts.") (internal quotation omitted).

position at that location at least by January 14, 2013, when Hess informed him that there was a "snag" and that the regional partner (Hess's boss's boss) was insisting Maher move to Waukesha. (Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 43; Maher Depo., Ex. 9 (dkt. #26-6) ECF 7.) Even if at that time Maher believed that he could move at some point while he was a managing partner, rather than as a condition of his employment, by January 16, Hess told him unambiguously that "commuting from Sun Prairie to Waukesha was not an option" just two days later (Defs.' PFOFs (dkt. #22) ¶ 52 (citing Hess Decl. (dkt. #24) ¶ 29)), something Maher does not dispute. Moreover, subsequent communications further reflect that Maher fully understood that the move was part of any offer of employment. (*See* Pl.'s Resp. to Defs.' PFOF (dkt. #29) ¶ 56 (Maher sent Hess a text stating, "I just wanted to know from you if Waukesha is 100 percent if I move. Or if I decide not to [do] that you 100 percent have a spot for me with manager pay.").) While perhaps a reasonable jury could find that an offer of employment was made around January 14, 2013, that offer was premised on Maher moving to Waukesha, and it was ultimately *Maher's* decision to decline that offer and accept the kitchen manager position in Madison instead.

Plaintiff's promissory estoppel claim fails for the same reason. Even accepting that the promise need not be as definite as a contract to support a promissory estoppel claim, *Skebba v. Kasch*, 2006 WI App 232, ¶ 8, 297 Wis. 2d 401, 724 N.W.2d 408, there must be "a manifestation of intent by the promisor to be bound, [which] is to be judged by an objective standard." *Major Mat Co. v. Monsanto*, 969 F.2d 579, 583 (7th Cir. 1992); *see also* E. Allan Farnsworth, Farnsworth on Contracts, § 2.19, p.175 & n.30 (promise must be "clear and definite"). Here, there was *no* promise of employment at the Waukesha

27

location at the time Maher resigned from his prior position at Red Robin. Maher resigned from Red Robin on January 16, 2017, at which point, as described above, Maher *knew* that the Waukesha location position was contingent on him moving.[16] *See Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*, 486 F. Supp. 2d 855, 863 (W.D. Wis. 2007) (granting summary judgment to defendant on promissory estoppel claim where subsequent communications clarified requirements of franchise relationship). Almost certainly at that time, if Maher was willing to move, the position was his for the taking, but there was *no* promise of employment not conditioned on his moving.[17]

Finally, plaintiff's fraud claims based on the Waukesha position fails for the same reasons. Because Hess made no promise or offer, whether he had the authority to do so is immaterial. Regardless, plaintiff has offered *no* authority that Hess had a duty to disclose that he lacked authority here,[18] much less that he could reasonably rely on this non-disclosure since: (1) Maher was aware of Hess's role as a managing partner of another

---

[16] Plaintiff also asserts on summary judgment that he did not accept the Doolittle's GM offer he received on December 6, 2013, based on the so-called Waukesha promise, but here, too, fails to establish reliance on a promise, at least not one conditioned on him moving to Waukesha.

[17] Even assuming there was a promise, plaintiff's claim would also fail on the third element -- that injustice can only be avoided by enforcement of the promise -- which is a policy issue for the court. *See Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267 (Wis. 1965) (describing elements). In light of the record demonstrating that the parties were negotiating terms of employment at the time plaintiff resigned from his prior position, and that the resignation was, at least in part, because Maher's employment search was leaked to his former boss, there is no injustice warranting enforcement of defendants' purported promise.

[18] Plaintiff cites *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 41, 288 N.W.2d 95, 107 (1980), for the proposition that Hess was required to disclose his lack of authority to Maher, but the duty in *Ollerman* was expressly intended to be a "narrow holding" regarding residential real estate transaction, at best leaving open the question whether such a duty existed in this context. Regardless, any reliance on this non-disclosure was plainly unreasonable for the reasons set forth above.

restaurant; (2) even more importantly, he knew that he had to meet LaPointe, the market partner and Hess's boss at that time, *as part of the hiring process*; and (3) it was LaPointe who had to "finalize" any offer. (Defs.' Resp. to Pl.'s Add'l PFOFs (dkt. #37) ¶ 154.) And again, Maher's own testimony undermines a reasonable jury finding that he relied on that promise to resign given that he only opted to resign after his then manager at Red Robin asked if he was looking for other employment.

### B. Claims Based on Madison Managing Partner Position

As for plaintiff's assertion of similar claims based on the Madison managing partner position, while Maher contends that he would not have considered, let alone taken, the kitchen manager position, with its $30,000 pay cut, without the promise of a managing partner position, plaintiffs' claims fail because there was *no* promise of a Madison managing partner position or misrepresentations to that effect. As extensively described above, Hess's statements as to the availability of a Madison position were at least uncertain as to timing. Hess described the possibility of a Madison managing position as a "wild card" option, which by definition is "unknown" or "unpredictable." *See* "Wild Card," Meriam Webster, *available at* https://www.merriam-webster.com/dictionary/wild%20card.

To support a promissory estoppel claim, Maher must put forth evidence of an *enforceable* promise. "Mere predictions or statements of opinion are not promises supportive of a promissory estoppel cause of action." *Major Mat Co. v. Monsanto Co.*, 969 F.2d 579, 583 (7th Cir. 1992); *see also Cosgrove v. Bartolotta*, 150 F.3d 729, 733 (7th Cir. 1998) ("[L]egally enforceable promise must be induced by reasonable expectation promise will be carried out -- insufficient if vague and hedged with conditions, such that he knows he is

investing for a chance.").  Moreover, as Maher conceded during his deposition, a promotion to managing partner would be "conditioned on proving that [he] could do the position." (Maher Depo. (dkt. #26) 176; *id.* (Maher disagreeing with statement that he was promised that promotion "regardless of performance").)  As such, any promotion to some future Madison managing partner position was necessarily conditional and not definite.  While the court fully credits for purposes of summary judgment that Maher took the lower-paying position of kitchen manager in hopes of a promotion, plaintiff has failed to put forth any evidence to support his theory that defendants offered or promised him that position, much less that they were obligated to do so in light of the largely undisputed evidence that Hess had significant performance concerns about Maher during his time as kitchen manager and interim managing partner.  Even if Hess failed to adequately and timely explain those concerns, there is also undisputed evidence that those employees under Maher's management were reporting strong dissatisfaction.

Plaintiff's fraud claims also fail because Hess's alleged misrepresentations about future events can only be actionable if he had present knowledge inconsistent with those misrepresentations.  *See Hartwig v. Bitter*, 29 Wis. 2d 653, 656, 139 N.W.2d 644, 646 (1966).  Here, Hess did not *know* a west side location would become open, or whether he would be promoted to market partner opening up the managing partner position in Madison, giving Hess the ultimate authority to hire Maher for that position.  As the Wisconsin Court of Appeals explained in *Bellon v. Ripon Coll.*, 2005 WI App 29, 278 Wis. 2d 790, 693 N.W.2d 330, "predictions as to future economic events are not generally actionable misrepresentations. It would be illogical to hold that failure to predict the future

constitutes misrepresentation." *Id.* at ¶ 10 (internal citation omitted). Furthermore, as described above, the record evidence demonstrates that at the time Maher alleges the misrepresentations were made, Hess used language reflective of the conditional or uncertain status of any Madison position -- "my suggestion"; "my hope"; "until an option arises"; "I have to leave that open ended"; and "I can't predict." (Defs.' Opening Br. (dkt. #21) 31.) In short, Maher has failed to offer evidence from which a reasonable jury could find a definite statement or promise of a Madison position necessary to support a claim of fraud.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #20) is GRANTED.

2) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 30th day of June, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge